William Todd DAVIS, Appellant,

v.

William E. DAVIS and Carolyn Davis, d/b/a Asphalt Maintenance Specialists, Appellees.

No. 2009–CA–002127–MR.

Court of Appeals of Kentucky.

April 1, 2011.

Stephen E. Neal, Mt. Sterling, KY, for Appellant.

John F. Estill, Maysville, KY, for Appellees.

Before LAMBERT, NICKELL, and WINE, Judges.

## OPINION

LAMBERT, Judge:

William Todd Davis (Todd) has appealed from the judgment of the Fleming Circuit Court in favor of William E. Davis and Carolyn Davis, d/b/a Asphalt Maintenance Specialists, (the plaintiffs or the appellees) awarding them $124,196.57 as well as several items of equipment. Todd contends that the trial court committed reversible error in its judgment related to the ownership of the company and its equipment, as well as to the money he owed for real estate and improvements, misappropriation of business funds, and improperly obtaining clients and contracts. Having reviewed the record on appeal and the parties' arguments in their respective briefs, we find no error and affirm the trial court's judgment.

In the 1990s, William E. Davis (Bill) started a blacktopping business, operating it as a sole proprietorship under the name Asphalt Maintenance Specialists (AMS). Carolyn Davis is Bill's wife. Carolyn assisted Bill with the bookkeeping and eventually ran the sealing and striping side of the business. Todd is Bill and Carolyn's son. Todd, who was thirty-four years old at the time of the hearing in 2008, began working for AMS shortly after he graduated from high school in the mid–1990s. Todd started as a laborer and progressed through the years to eventually run the blacktopping side of the business. He was also responsible for giving blacktopping bids. For his work, Todd received a salary of up to $700.00 per week. In addition to his salary, all of his living expenses, including his house payment, utilities, gas, insurance, and groceries, were paid by the company, and he was provided with a truck. We note that Bill and Carolyn maintained only one bank account, in which business and personal assets were deposited and from which both business and personal bills were paid, including those belonging to Todd.

In addition to paying his everyday expenses, Bill and Carolyn took out an equity loan to pay off a debt on property Todd was purchasing and provided Todd with other money to pay for a later purchase of real estate. Todd constructed a house on the real estate he had purchased. Materials, fixtures, furnishings, and other improvements were purchased and paid for using accounts in Carolyn's or the business's name. Todd also traded blacktop work for insulation in his house.

Todd's claim throughout this case has rested on Bill's promise that he would give the business to him when he retired. Bill stopped working in the field due to health issues in the mid–2000s. In March of 2007, Bill and Todd began negotiations to transfer AMS to Todd in whole or in part. While Todd consulted with an attorney, no transaction was ever consummated. During this period of time, however, the parties agreed to split the income and expenses from the blacktopping side of the business away from the rest of the business, and Todd would take on a more active management role for the blacktopping side. Todd opened his own AMS account and was to pay his parents' expenses from the proceeds of that side of the business. Todd failed to pay those expenses, and he had the business phone moved to his own house, leaving his parents without phone service.

Problems between the parties escalated, and Todd left AMS on June 12, 2007. He also opened his own paving business, T & K Paving, with his girlfriend, Kristina Logan. Todd took the paving equipment from AMS to form his new company. He also used T & K Paving to complete jobs he had bid for AMS.

On June 29, 2007, the plaintiffs filed suit against Todd and Kristina (who was dismissed by the trial court and is not a party to this appeal), seeking damages for Todd's taking business funds for his personal use, his failure to repay money advanced related to the purchase and construction of his house, and for his interference with their business. They also sought the return of the business equipment Todd took with him when he left AMS. Todd filed a counter-claim against the plaintiffs, alleging that he, as a partner and/or with an ownership interest in AMS, was entitled to a share of all revenue and income received by the plaintiffs through AMS, as well as the equipment.

The trial court held a two-day bench trial. Prior to the start of the trial, the court determined that Todd was entitled to summary judgment on the issue of whether he had signed a non-compete clause. At the conclusion, the trial court entered its findings of fact, conclusions of law, and judgment, in which it found that AMS was a sole proprietorship owned by Bill, that Todd was not an owner of AMS, and that any equipment or vehicles in the names of AMS, Bill, or Carolyn were not Todd's property. The court then found that as an employee of AMS, Todd owed a duty of good faith, which he breached when he tortiously interfered with AMS's contracts, used AMS's equipment and supplies, and kept the profits for himself. The trial court permitted recovery of the profits from those jobs. The trial court also permitted recovery for funds that Todd misappropriated for AMS jobs. Regarding Todd's house, the trial court concluded that there was at least an implied contract that Todd was to repay amounts provided for the purchase of real estate and the construction of the house. The trial court awarded the sum of $124,196.57 to the plaintiffs and ordered the exchange of equipment and personalty as ordered in the judgment. This appeal follows.

In his brief, Todd argues that the trial court erred in its findings and conclusions on four separate issues related to the repayment for real estate and improvements to his house, the ownership of AMS and its equipment, misappropriation of funds, and interference with AMS's business contracts. We shall address each issue in turn.

Because this matter was tried without a jury, Kentucky Rules of Civil Procedure (CR) 52.01 applies to our review:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.] ... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses....

"On appeal, if a trial court's findings are supported by substantial evidence, those findings will be upheld as not being clearly erroneous." *Waters v. City of Pioneer Village*, 299 S.W.3d 278, 280 (Ky.App. 2009). Substantial evidence is defined as "evidence, when taken alone or in light of all the evidence, which has sufficient probative value to induce conviction in the mind of a reasonable person." *Hunter v. Hunter*, 127 S.W.3d 656, 659 (Ky.App. 2003). This Court's review of a trial court's application of law to sufficiently supported facts is *de novo*. *Waters*, 299 S.W.3d at 280.

## A. TODD'S HOUSE AND REAL ESTATE

■ The first argument Todd raises is that the trial court erred when it adjudged that he owed the plaintiffs (now the appellees) for the amount they paid for his real

estate and improvements to that real estate. Todd asserts that the statute of frauds bars their recovery in this case because there was no written agreement that he would repay those amounts. Furthermore, Todd contends that the trial court's determination that there was either an express contract or a meeting of the minds between the parties was not supported by case law or admissions Bill and Carolyn made. He also argues that the trial court should have deemed the payments to be a gift based on his status as their son, a natural object of their bounty.

■ The trial court first found that there was an agreement between the parties that Todd was to repay the funds paid by the appellees. Both the trial court and the appellees cite to *Rider v. Combs,* 256 S.W.2d 749 (Ky.1953), to establish this agreement. In order to establish an implied contract, *Rider* provides:

> To establish a contract implied in fact, the evidence must disclose an actual agreement or meeting of the minds although not expressed and such is implied or presumed from the acts or circumstances which according to the ordinary course of dealing and the common understanding of men shows a mutual intent to contract.

*Id.* at 749. While *Rider* addresses the performance of personal services, we perceive no reason that this case should not apply in cases involving real estate, as Todd suggests.

The record supports the trial court's findings that Bill and Carolyn invested a substantial amount of money into Todd's land and house. Todd's statements that he would "take care" of money he requested from his parents or charged to their accounts is sufficient to establish this implied agreement in light of the circumstances and his problems obtaining financing to complete construction of his house.

Todd argues that there was no way to distinguish between amounts and items Bill and Carolyn gave him as their son or paid him as their employee. However, we note that the trial court did not award all of the sums the appellees requested based on its findings that such funds were considered gifts pursuant to the testimony. We therefore agree with the appellees that the trial court did not err in finding the existence of an implied contract.

Todd also argues that several provisions of Kentucky's statute of frauds bar the appellees from enforcing any implied contract because their agreement was not reduced to writing. KRS 371.010 provides, in part, that

> No action shall be brought to charge any person:
>
> . . . .
>
> (7) Upon any agreement that is not to be performed within one year from the making thereof;
>
> (8) Upon any promise, agreement, or contract for any commission or compensation for the sale or lease of any real estate or for assisting another in the sale or lease of any real estate; or
>
> (9) Upon any promise, contract, agreement, undertaking, or commitment to loan money, to grant, extend, or renew credit, or make any financial accommodation to establish or assist a business enterprise or an existing business enterprise including, but not limited to the purchase of realty or real property, but this subsection shall not apply to agreements pursuant to which credit is extended by means of a credit card or similar device, or to consumer credit transactions;
>
> unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the

party to be charged therewith, or by his authorized agent. It shall not be necessary to express the consideration in the writing, but it may be proved when necessary or disproved by parol or other evidence.

■ The appellees first rely upon *Phelps v. Ham*, 273 S.W.2d 814 (Ky.1954), to argue that the exhibits showing payments made for the house and credit card statements are sufficient to satisfy the writing requirement. We disagree. The writings relied upon in *Phelps* were receipts for monthly payments made by Mr. Ham to his sister for the purchase price of the building in which they lived. These receipts were much more specific to establish the agreement than the exhibits in this case. The evidence here goes to the amount of funds that were expended, rather than establishing the contract itself as in *Phelps*. Therefore, we reject the appellees' contention that the exhibits they submitted brought the matter outside the statute of frauds.

However, we do agree with the appellees that the provisions Todd relied upon to argue that the agreement falls outside the scope of the statute of frauds do not apply in this case.

■ KRS 371.010(7) addresses when the agreement is to be performed, specifically those that are not to be performed within one year. The appellees cite to *Salyers v. Kenmont Coal Co.*, 226 Ky. 655, 11 S.W.2d 705, 707–08 (1928), for the proposition that if a contract may be performed within a year, it is outside of the scope of the statute of frauds:

> Ordinarily the rule is that, where a contract may be performed within a year, or where a contract for personal services may be terminated by either party within a year, it is not within the statute of frauds. This question is fully discussed in the case of *Dickey v. Dick-*

*enson [Dickinson]* in an opinion written by Judge Hazelrigg, 105 Ky. 748, 49 S.W. 761, 20 Ky. Law Rep. 1559, 88 Am. St. Rep. 337 [ (1899) ]. In the case of *East Tennessee Telephone Co. v. Paris Electric Co.*, 156 Ky. 762, 162 S.W. 530, Ann.Cas. [Am.Ann.Cas.] 1915C,543 [ (1914) ], this court, in an opinion written by Judge Carroll, discussed the question at some length, and held to the doctrine that contracts for the performance of which no time is fixed, but which from their subject-matter admit of performance within a year, are not within the statute of frauds, although it is probable that the contract will be performed after the year.

We agree that the parties certainly would have contemplated performance of the contract within one year as it involved completing construction of the house so that the construction loan could be converted into permanent financing. We also note with approval the appellees' citation to *Finley v. Ford*, 304 Ky. 136, 141, 200 S.W.2d 138, 141 (1947) ("We have also held that if the performance of an oral contract depends upon a contingency, which may or may not happen within the year, it is not within the statute."). Accordingly, we hold that KRS 371.010(7) does not act to bar enforcement of the agreement in this case.

■ Likewise, the agreement does not come within the scope of KRS 371.010(8) or (9). The agreement did not provide for the commission or compensation for the sale of real estate, nor did it provide for the establishment of a business enterprise. Rather, it was an agreement to loan funds to an individual,

Therefore, we reject Todd's argument that the statute of frauds bars the appellees' right to recovery in this action.

Finally, Todd contends that the trial court was required to infer that the funds

were intended as a gift from parents to their son, citing to *Rakhman v. Zusstone,* 957 S.W.2d 241 (Ky.1997). He argues that as their son, he is the natural object of his parents' bounty. Todd then states that Bill and Carolyn failed to prove that they did not intend to make a gift to him. The Supreme Court set out the relative burdens in *Rakhman* as follows:

> [T]he proper allocation of the burden of going forward would have been to note that the placing of title by Zusstone in Rakhman raised a rebuttable presumption that he had made a gift to Rakhman, the natural object of his bounty. Once Zusstone put in his own testimony and the evidence of his prior real estate transaction history, Rakhman bore the "risk of nonpersuasion," as opposed to the more demanding "clear and convincing" standard of proof required to establish a trust. This burden can also be described as the "preponderance of the evidence" or "more probably true than not." R. Lawson, *The Kentucky Evidence Law Handbook,* § 9.00, at 517 (3d ed.1993).

*Rakhman,* 957 S.W.2d at 245–46. Here, the evidence establishes that the appellees did not intend to make a gift to Todd, and they successfully rebutted any presumption associated with his status as their son.

For these reasons, we hold that the trial court did not err in awarding the appellees a judgment for sums they paid related to Todd's house and land.

### B. OWNERSHIP OF AMS

■ Next, Todd argues that the trial court erred in finding that AMS was solely owned by Bill and that he (Todd) had no ownership interest in either the company or its vehicles, equipment, and personal property. This argument is based on Todd's assertions throughout the proceedings that Bill had promised to give him the company upon his retirement. In support, Todd again relies upon *Rakhman v. Zusstone* for its presumption in favor of him as the natural object of his father's bounty. Again, we disagree.

The trial court's extensive findings on this issue are adequately supported by the evidentiary record. There is absolutely no evidence to establish that Todd was ever an owner or even a partial owner of AMS. On the contrary, the evidence establishes that Bill set up AMS as a sole proprietorship and that Todd worked for AMS as an employee only. For his work as an employee, Todd received a salary and all of his bills were paid through the company. However, he never had any responsibilities associated with ownership, including authority to sue and enter into contracts, or responsibility for company debts, and he signed his name as "manager." While Bill had certainly discussed "giving" the company to Todd when he retired (he stopped working in the field in 2004 for health reasons), that "transfer" never came to pass, despite later discussions among the parties and with an attorney. Witness Julia Davis Rawlings, Todd's sister and Carolyn and Bill's daughter, also testified that Todd did not own any part of AMS, although there had been preliminary conversations about a potential partnership. Based upon the substantial evidence on this issue introduced into the record, the trial court did not err in finding that Todd had no ownership interest in AMS.

Likewise, Todd has no ownership interest in any of the vehicles, trucks, or other equipment, including the Leeboy Paver, titled in name or names of AMS, Bill or Carolyn. *See Rakhman v. Zusstone,* 957 S.W.2d at 244 ("[I]t has long been the law in Kentucky that '[r]ecord title or legal title is an indicia sufficient to raise a presumption of true ownership.' ").

## C. MISAPPROPRIATION OF FUNDS

■ For his next argument, Todd contends that the trial court erred in awarding sums to the appellees that he had misappropriated from AMS funds. On this issue, the trial court found, in part, as follows:

24. Carolyn Davis testified that she commenced having substantial problems with Todd in 2006, because she did not know what work he was doing, or what he was doing with the money. He either did not make estimates, invoices or receipts for the work that he did, or did not provide same to Bill Davis and Carolyn Davis. Carolyn said that eventually so little of the money was going into the AMS account that there was not enough money for Bill and Carolyn Davis to buy groceries or to pay their basic expenses.

25. Todd Davis admitted that it became common for him to pull portions of cash out of payments for AMS jobs, but claimed that his parents authorized him to do so. Through the testimony of both Carolyn Davis and Todd Davis, it was established that Todd would give an estimate, and then when the customer paid Todd would keep a portion and deposit the rest in the AMS account, such checks usually being made payable [in] the name of AMS. Carolyn testified that Todd was authorized to receive checks or other payment on behalf of AMS, but he was supposed to deposit the checks in AMS' business account.

Todd now argues that the funds he retained were amounts he was legitimately entitled to receive as either the owner or employee of AMS, or were amounts Bill and Carolyn allowed him to keep as the natural object of their bounty. We disagree.

■ As stated by the appellees, an employee must be loyal and faithful to his employer. *See Hoge v. Kentucky River*

*Coal Corp.*, 216 Ky. 51, 287 S.W. 226 (1926). Based upon the evidence of record, the trial court's finding that Todd had been misappropriating money from AMS is amply supported. While the record shows that Todd's personal expenses were generally paid with AMS funds, he was certainly not an owner of AMS, nor was he in a position to unilaterally keep payments, or portions thereof, made to AMS. Accordingly, we hold that the trial court appropriately awarded the appellees the amounts Todd misappropriated from AMS as reflected in the judgment.

## D. TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS

■ Finally, Todd argues that the trial court erred when it found that he tortiously interfered with five business contracts and required him to repay the profit he received from these contracts. He states that he was not restricted by a covenant not to compete and that one should not be implied in this case.

The trial court found that while he was still employed at AMS, Todd began a new company called T & K Paving, ordered new stationery and purchased a fax machine for that business, and charged everything to AMS. He also took possession of the paver and other AMS equipment. Todd then completed AMS jobs as T & K Paving after he left AMS on June 12, 2007. In several instances, Todd would submit new bids identical to those of AMS, but using T & K Paving stationery. The trial court relied upon *Stewart v. Kentucky Paving Company, Inc.*, 557 S.W.2d 435 (Ky.App.1977), for its holding regarding the violation of a duty of loyalty to an employer. The Court explained that:

After the termination of his fiduciary relationship he is allowed the freedom to compete, and he may carry with him his

personal experience, enterprise, and knowledge, but he may not use prior fiducial confidences to profit at the expense of his former employer.

*Id.* at 438 (quoting *Aero Drapery of Kentucky, Inc. v. Engdahl,* 507 S.W.2d 166 (Ky.1974)). Therefore, the trial court permitted the appellees to recover any profits Todd derived from any of his work, efforts, leads, and contracts that were developed while he was still working for AMS.

■ We agree with the appellees that *Kentucky Paving* and *Hoge* support the trial court's holding that Todd owed a duty of loyalty to them, which he breached when he used his knowledge of AMS business as well as AMS equipment and supplies to procure and complete contracts for his own, separate company. As stated in *Hoge,*

> Everyone—whether designated agent, trustee, servant or what not—who is under contract or other legal obligation to represent or act for another in any particular business or for any valuable purpose must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law.

*Hoge,* 287 S.W. at 227. The trial court properly awarded only the established net profit from the amount Todd received from completing the five jobs at issue pursuant to *Kentucky Paving.* The undisputed fact that the parties had not entered into a covenant not to compete has no application to this issue, as it is premised upon Todd's breach of loyalty to his former employer. Accordingly, the trial court did not commit any error in awarding the appellees the net profit from the five contracts with which Todd interfered.

For the foregoing reasons, the judgment of the Fleming Circuit Court is affirmed.

ALL CONCUR.