**INSIGHT KENTUCKY PARTNERS II, L.P., Appellant/Cross–Appellee**

v.

**PREFERRED AUTOMOTIVE SERVICES, INC., Appellee/Cross–Appellant**

**NO. 2014–CA–001189–MR AND NO. 2014–CA–001236–MR**

Court of Appeals of Kentucky.

JUNE 10, 2016; 10:00 A.M.

Discretionary Review Denied by Supreme Court April 19, 2017

Brief for Appellant/Cross–Appellee: Culver V. Halliday, Adam Goebel, Barry Lee Dunn, Louisville, Kentucky

Amicus curiae brief for the Kentucky Bankers Association: Debra Stamper, John T. McGarvey, M. Thurman Senn, Louisville, Kentucky

Brief for Appellee/Cross–Appellant: R. Kenyon Meyer, Jeremy Stuart Rogers, Louisville, Kentucky

BEFORE: DIXON, NICKELL, AND TAYLOR, JUDGES.

## OPINION

DIXON, JUDGE:

Appellant, Insight Kentucky Partners II, L.P., appeals from a judgment of the Jefferson Circuit Court following a jury trial finding it liable to Appellee, Preferred Automotive Services, Inc., for aiding and abetting a breach of fiduciary duty by Jerry Key, Preferred's former General Manager. Preferred has filed a cross-appeal challenging the trial court's reduction of the jury's award of punitive damages, as well as the denial of Preferred's motion to amend its complaint to add a trade secrets claim. For the reasons set forth herein,

we reverse and remand the matter for a new trial.

Preferred was formed in 2001 to provide vehicle repair and maintenance services. Brothers Brian Payne and Jack Payne together owned eighty percent of Preferred with Key owning the remaining twenty percent. Key was responsible for all of Preferred's daily operations. Preferred's corporate report filed with Kentucky's Secretary of State identified Key as president, vice-president, treasurer and sole director.

Soon after Preferred's formation, Insight began using Preferred for all of its local vehicle fleet maintenance and repair work. Key was the primary contact and managed all of Insight's business with Preferred. During the time period that Preferred provided services to Insight, Bob Mathena and Todd Knight were the Insight employees responsible for the company's vehicle fleet maintenance. It is undisputed that Preferred and Insight never entered into any type of contract.

In June 2007, the Paynes accused Key of embezzling from Preferred. Rather than terminate Key, however, the Paynes chose to take over all financial responsibilities, although Key continued to manage the other daily operations. However, Preferred's annual corporate report filed in July 2007 identified Brian Payne as president, Jack Payne as vice-president, and both Paynes as the only directors of Preferred. Key was listed only as a shareholder. Preferred's 2008 annual report contained the same information, except that Key was no longer identified in any capacity.

On January 13, 2009, the Paynes again accused Key of embezzling money from Preferred. Key contended that he was terminated on that date and never returned to or had any further responsibilities with Preferred. Indeed, the record herein contains Preferred's payroll records reflecting that Key was "TERMINATED 1/13/09" as well as a letter dated February 18, 2009, from Brian Payne to Preferred's vendors stating that "Key is no longer employed by Preferred Automotive as of January 13, 2009." In addition, Payne testified at trial that Key had no authority to do anything on Preferred's behalf after January 13, 2009. Nevertheless, Preferred claimed that Key was not terminated on January 13th, but rather took "time off to think about the situation," and intended to return to work. Preferred contended that despite its records to the contrary, Key, in fact, remained an employee until January 30, 2009, because he had a company cell phone and insurance benefits until that date, as well as remained a corporate director until 2010.[1]

Sometime between January 13th and January 30th, Key met with Mathena and Knight and discussed the possibility of Insight moving its business if Key obtained employment elsewhere. At the end of January 2009, Key met with Robert Johnson, the owner of Southside Automotive and arranged to rent a building to start a vehicle fleet maintenance business to compete with Preferred. Key hired two of Preferred's longtime mechanics and began operations under the name of Southside Automotive. Around the middle of February 2009, Insight began sending some of its vehicles to Southside. At the same time, Insight also increased its use of other

1. Curiously, in July 2009, shortly after Preferred instituted legal action against Key, Preferred filed its 2009 annual corporate report, which identified Key as a director for the first time since 2006. Although Key maintained that he had not been identified on a corporate report in any capacity since 2007, he nonetheless executed a formal resignation of any purported director status.

vendors including Nationwide Truck Service for maintenance work, Jim Berry Collision Center for body work, and Mosby Towing for towing services.

In March 2009, a billing dispute arose between Preferred and Insight. Specifically, in a March 11th letter to Bob Mathena, Brian Payne accused Insight of defamation by "passing rumors" that Preferred was double billing and otherwise cheating Insight. As evidenced through a string of internal e-mails, Insight thereafter made the decision to terminate its relationship with Preferred, noting specifically that there was no contract prohibiting it from doing so.

In June 2009, Preferred filed an action against Key asserting breach of fiduciary duty, conversion and fraud. That lawsuit was settled in 2010. Preferred thereafter filed a lawsuit against Southside and Johnson in August 2010, alleging aiding and abetting a breach of fiduciary duty, misappropriation of trade secrets, and tortious interference. That lawsuit similarly settled in November 2011.

In January 2012, Preferred filed the instant action against Insight alleging that Insight (1) tortiously interfered with a noncompete agreement between Key and Preferred, and (2) aided and abetted a breach of fiduciary duty owed by Key to Preferred. A nine-day jury trial was held beginning January 27, 2014. Preferred sought $4,340,000 in lost profit damages. Despite not having a contract, Preferred based its damages upon the assumption that Insight would have continued to send all of its business to Preferred from the time Preferred lost Insight as a customer in 2009 until 2022. Preferred also sought $22 million in punitive damages.

At the close of Preferred's proof, the trial court granted Insight's motion for a directed verdict on the tortious interference claim. With respect to the aiding and abetting claim, Preferred asserted that Insight knew that Key owed fiduciary obligations to Preferred and it nonetheless helped Key breach that duty by assisting him in establishing a new business to compete with Preferred and by encouraging Key to utilize confidential information he obtained from Preferred for Insight's benefit and to the detriment of Preferred. At the close of evidence, the jury found that Insight aided and abetted a breach of fiduciary duty owed by Key to Preferred and awarded $2 million in compensatory damages and $2 million in punitive damages. The trial court apportioned the compensatory damages 50% to Key, 35% to Insight, and 15% to Preferred. As a result, the original trial judgment awarded Preferred $2.7 million in damages.

Insight thereafter filed a motion for judgment notwithstanding the verdict (JNOV), as well as motions to alter, amend or vacate the judgment and for a new trial. Following an extensive hearing, the trial court denied the JNOV and new trial motions. However, the trial court granted the motion to alter, amend or vacate, in part, by reducing the punitive damages award from $2 million to $1.4 motion on the grounds that the award was the result of "passion, prejudice, and/or bias as to [Insight's] financial status and sympathy for employees of [Preferred], given [Insight's] degree of reprehensibility and the lack of contact between the parties." Insight then appealed to this Court. Preferred has filed a cross-appeal on several issues. Additional facts are set forth as necessary.

Before we turn to the issues herein, we would note that this case involved a nine-day trial and a voluminous record. The hearing on Insight's post-trial motions lasted over two hours and involved a multitude of issues. Yet, the trial court made no rulings from the bench, nor did it in-

clude any findings or rationale in its orders denying the motions for JNOV and new trial. In *CertainTeed Corporation v. Dexter,* 330 S.W.3d 64, 74–75 (Ky.2010), our Supreme Court in reviewing an appeal from a trial court order granting a new trial, commented,

> The reason appellate courts defer to the trial court's decision to grant a new trial is because the decision may depend on factors that do not readily appear in the appellate record, such as witness demeanor and observations of the jury.... But that deference does not make such decisions beyond review. Thus, it is crucial that the factors going into the decision appear somewhere in the trial record, or else there may be no record of them at all. Even if the record is complete, the trial judge's evaluation of this evidence, recorded as findings of fact in support of the decision, are just as important, at least from the appellate perspective. Otherwise, an appellate court has to sift through a voluminous record to see what possibly could have been the basis for the ruling, which wastes judicial resources and begs for erroneous reversals.

> In this case, for example, the trial court simply found that the jury's verdict in the first trial was "manifestly unsupported by the evidence and manifestly a product of jury passion and prejudice." While these are findings of fact, of a sort, they lack of any discussion of the evidence supporting them, which makes their review difficult. Though CR [Kentucky Rules if Civil Procedure] 59.01 does not currently require them, the better practice is for a trial court to include in its order at least some specific findings regarding the evidence (or lack of evidence) that supports the ultimate decision to grant or deny the motion for a new trial.

Admittedly, our review of this matter has been made more difficult because of the absence of any findings or reasoning supporting the trial court's rulings on the post-trial motions. Given the complexity of this case, the trial court's evaluation of evidence and factors not readily apparent from the record would have greatly benefitted this Court in our review. With that, we now turn to the issues presented.

## DIRECTED VERDICT/JNOV

Insight first argues that the trial court's judgment should be vacated because Preferred failed to prove the necessary elements of aiding and abetting a breach of fiduciary duty. As such, Insight contends that the trial court erred in failing to grant its motions for a directed verdict and/or JNOV.

The standard of review regarding a motion for a directed verdict or JNOV has been described as a difficult one for an appellant to meet. *Peters v. Wooten,* 297 S.W.3d 55, 65 (Ky.App.2009). In *Taylor v. Kennedy,* 700 S.W.2d 415 (Ky.App.1985), a panel of this Court described it as follows:

> In ruling on either a motion for a directed verdict or a motion for judgment notwithstanding the verdict, a trial court is under a duty to consider the evidence in the strongest possible light in favor of the party opposing the motion. Furthermore, it is required to give the opposing party the advantage of every fair and reasonable inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or judgment n.o.v. unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ.

*Id.* at 416 (citation omitted).

In reviewing evidence supporting a judgment entered upon a jury verdict,

the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for a directed verdict or JNOV. *See Bierman v. Klapheke,* 967 S.W.2d 16 (Ky.1998); *NCAA v. Hornung,* 754 S.W.2d 855 (Ky.1988). All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. We may not disturb the trial court's ruling unless the decision is clearly erroneous. *Peters v. Wooten,* 297 S.W.3d 55, 65 (Ky.App.2009) (citing *Bierman,* 967 S.W.2d at 18). As such, a denial of a directed verdict or JNOV "should only be reversed on appeal when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.* (citation omitted).

▉ Kentucky follows the Restatement (Second) of Torts, § 876 in defining the elements of aiding and abetting. To prevail on a claim of aiding and abetting a breach of fiduciary duty, a plaintiff must prove the following elements: (1) the existence and breach of a fiduciary relationship; (2) the defendant gave the breaching party "substantial assistance or encouragement" in effectuating the breach; and (3) the defendant knew that the party's conduct breached that fiduciary duty. *Miles Farm Supply, LLC v. Helena Chem. Co.,* 595 F.3d 663, 666 (6th Cir.2010) (citations omitted) (applying Kentucky law). Insight claims, as it did in the trial court, that Preferred failed to prove any of the above elements.

▉ Preferred had to first prove that Key breached a fiduciary duty. A claim for breach of fiduciary duty requires that a plaintiff allege that "(1) the defendant owes a fiduciary duty to the plaintiff; (2)

the defendant breached that duty; and (3) the plaintiff suffered damages as a result of the breach." *Fastenal Co. v. Crawford,* 609 F.Supp.2d 650, 665 (E.D.Ky.2009). "The scope of the fiduciary duty has been variously defined as one requiring utter good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing." *Lach v. Man O'War, LLC,* 256 S.W.3d 563, 569 (Ky.2008) (quoting *Anthony v. Padmar, Inc.,* 320 S.C. 436, 465 S.E.2d 745, 752 (S.C.Ct.App.1995)). Preferred alleged that while Key was still a fiduciary he (1) formed Southside to compete with Preferred; (2) misappropriated Preferred's confidential information about Insight's vehicle fleet; and (3) hired Preferred's "key" employees. Preferred also argued that Key breached his fiduciary duties throughout the tenure of his employment by diverting resources to Insight in the form of free service perks to Insight employees and gift cards to Mathena and Knight.

Insight contends that the evidence at trial affirmatively established that Key was not a fiduciary after January 13, 2009, when he was terminated from Preferred. Insight relies upon the decision in *Aero Drapery of Kentucky, Inc. v. Engdahl,* 507 S.W.2d 166, 170 (Ky.1974), wherein the Court held that the end of a fiduciary relationship coincides with the "termination of actual responsibilities." Insight points out that even if Preferred's position that Key was not terminated until January 30, 2009, is taken as true, Preferred nonetheless conceded that he had no responsibilities or authority to act on behalf of Preferred after January 13, 2009.

▉ Consequently, Insight argues that Key did not breach any fiduciary duty to Preferred. As Insight notes, "[s]ettled law permits an employee to prepare to compete with his employer before leaving the company, provided the employee does

not act unfairly or otherwise injure his principal before the departure." *Miles Farm Supply, LLC,* 595 F.3d at 667. Further, a fiduciary may compete after the fiduciary relationship has ended, *see Aero Drapery,* 507 S.W.2d at 169–70, and even has the right to solicit a former employee's customers. *Venture Express, Inc. v. Zilly,* 973 S.W.2d 602, 604 (Tenn.App.1998). As such, Insight contends that Key did not breach any fiduciary duty because Southside did not begin operations until after he was terminated from Preferred.

Similarly, Insight argues that Key did not misappropriate any confidential information, but rather utilized his own knowledge and skills that he acquired while employed by Preferred. The business information that Preferred contends was confidential included (1) the repair history of Insight's vehicles; (2) information regarding the parts used on the vehicles; (3) warranty information on those parts; (4) pricing of the repair work done on Insight's vehicles; and (5) the inventory necessary to maintain Insight's fleet. Insight points out, however, that much of that information was included on the service invoices provided to Insight. The record indicates that the invoices typically contained the year, make and model of the repaired vehicle; the repaired vehicle's license number, Insight's unit number and VIN number; the repaired vehicle's mileage; the parts installed on the vehicle, including the part name, number and price; the hours spent on labor; and the amount charged for labor. Moreover, Insight argues that it was certainly entitled to the maintenance and repair information on its own fleet, and would certainly have had the right to provide that information to another vendor to whom it used for maintenance. Insight posits that after termination of the fiduciary relationship, Key was permitted to "carry with him his personal experience, enterprise,

and knowledge" to compete with Preferred. *Stewart v. Kentucky Paving Company, Inc.,* 557 S.W.2d 435, 439 (Ky. App.1977) (quoting *Aero Drapery,* 507 S.W.2d 166).

Finally, Insight argues that Preferred's claim that Key breached his fiduciary duty by hiring Preferred's employees is without merit because the evidence was undisputed that Key hired mechanics Tyler Boone and Quentin Stevens after they were terminated by Preferred. Furthermore, Insight claims that any hiring prohibition applies only to "key" employees, and Preferred's own expert essentially testified that it is common for auto mechanics to frequently change jobs.

To establish aiding and abetting, Preferred had to next prove that Insight provided Key substantial assistance or encouragement in the alleged breach of fiduciary duty. Preferred alleged that Insight helped Key by (1) telling Key it would continue to do business with him and (2) verifying that Southside met Insight's insurance requirements and could handle its fleet maintenance.

Restatement (Second) of Torts § 876 provides that "substantial assistance" means that a defendant's conduct was a substantial factor in causing the tort. *Aetna Casualty & Surety Co. v. Leahey Const. Co.,* 219 F.3d 519, 537 (6th Cir. 2000). The comments to § 876 list factors to consider when determining whether substantial assistance has been provided: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." *Id.* (citation omitted). Further, "substantial assistance means something more than merely providing routine professional services that aid the tortfeasor in remaining in business, but do

not proximately cause the plaintiffs' harm." *El Camino Resources, Ltd. v. Huntington National Bank*, 722 F.Supp.2d 875, 911 (W.D.Mich.2010).

Insight argues that its decision to send its vehicles to Southside cannot be substantial assistance or encouragement because it was under no contractual obligation to do business with Preferred. In other words, because Insight had no contract with Preferred, its decision to direct business to Southside cannot result in liability for loss of that business. Furthermore, Insight argues that Mathena and Knight's conversations with Key about starting a new business can likewise not be considered substantial assistance because Key had no fiduciary duties after January 13th. Finally, Insight points out that verifying that Southside met its insurance requirement was done in the routine course of business and cannot support aiding and abetting a breach of fiduciary duty. *Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F.Supp.2d 508, 516 (S.D.N.Y.2012).

Insight finally claims that there was no evidence presented that it had knowledge that Key was a fiduciary or that his conduct may be a breach of his fiduciary duty. Insight argues that constructive knowledge does not suffice and that Preferred had to show that Insight actually knew not just that Key's conduct breached a fiduciary duty but also that he did not have consent from Preferred to seek out other opportunities. *Miles Farm Supply, LLC*, 595 F.3d at 666. Insight points out that Brian Payne, in meeting with Insight employees on several occasions, never informed them that Key remained a fiduciary and, in fact, specifically stated that Key had been terminated as of January 13th.

Therefore, Insight contends that Preferred failed to present any evidence that Insight had actual knowledge that (1) Key remained a fiduciary after being terminated, (2) Key's competition at Southside breached a fiduciary duty, (3) Key's use of nonconfidential information about Insight's own vehicles breach a fiduciary duty, or (4) Key's hiring of former Preferred employees breached a fiduciary duty. Thus, Insight maintains that Preferred failed to prove the necessary elements of aiding and abetting a breach of fiduciary duty and that the trial court erred by not granting its motions for a directed verdict or JNOV.

■ Admittedly, this is a very close case. Initially, we harbor doubts as to whether Key was a fiduciary at the time he allegedly met with Mathena and Key or when he started Southside Automotive. Insight claims that Key was terminated on January 13th while Preferred maintains that he only took time off with the intention of returning to work after that date. Undoubtedly, Preferred's claim that Key remained a director until 2010 is disingenuous at best. The record clearly indicates that he had not been listed in any capacity on Preferred's corporate reports since 2007, and it was only after litigation commenced that he reappeared as a director. Nonetheless, because there is some question as to whether Key remained employed until January 30th, we cannot conclude that there is a "complete absence of proof" that Key was a fiduciary at the time of the alleged tortious conduct. Further, if Key's employment did not end until January 30th *and* if Preferred is given every fair and reasonable inference from the evidence, it is not beyond reason that a jury could have found he breached his fiduciary duties to Preferred.

■ With respect to Insight's participation in Key's alleged breach, Preferred introduced some evidence that Mathena and Knight were aware that Key continued to have fiduciary "obligations" to Preferred at the time they discussed moving

Insight's business to Key/Southside. Preferred alleged at trial that Insight managers received kickbacks from Key and that is why they "colluded" with him to compete against Preferred. Again, while the evidence of record that Insight aided and abetted a breach of fiduciary duty is certainly weak, we simply cannot find that there was a complete absence of proof on the issue.

The trial court, in ruling on Insight's motions for a directed verdict and JNOV was required to give Preferred the advantage of every fair and reasonable inference which could be drawn from the evidence. Furthermore, it is not this Court's function to determine the credibility or the weight afforded to the evidence. Although we do not know the basis for the trial court denying the motions, we are compelled to find that there did exist sufficient disputed issues of fact upon which a reasonable jury could have differed so as to preclude a directed verdict or JNOV. Therefore, the trial court did not err in denying Insight's motions.

### JURY INSTRUCTIONS

Insight next argues that it is entitled to a new trial because the trial court erroneously instructed the jury on breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, the proper measure of damages, and apportionment of fault.

■■■ It is well-settled that Kentucky follows the bare bones approach to jury instructions in all civil cases. *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky.2005). *See also Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 824 (Ky.1992). However, fundamental to that approach is that all of the bones must be presented to the jury. Correct instructions are absolutely essential to an accurate jury verdict. The function of instructions is to tell the jury what it must believe from the evidence in order to resolve each dispositive factual issue in favor of the party who has the burden of proof on that issue. *See Webster v. Commonwealth*, 508 S.W.2d 33 (Ky.1974), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974). In light of the importance of correct jury instructions, erroneous instructions are presumed prejudicial. *McKinney v. Heisel*, 947 S.W.2d 32, 35 (Ky.1997). If it cannot be affirmatively shown that no prejudice resulted from the erroneous instruction, reversal is required. *Id.*

■■■ Insight first challenges the instruction given on the law of fiduciary duty. Instruction No. 2 provided:

A fiduciary relationship is founded on the trust and confidence that one person or entity places in another. The person in whom trust or confidence is placed is said to have a "fiduciary duty." This duty includes that he act primarily for the benefit of the other party in matters within the scope of their relationship.

It was the duty of Key to exercise the utmost good faith toward Preferred Auto while he was an officer, director, employee and/or general manager of Preferred Auto, by acting in Preferred Auto's best interests, by disclosing any conflict between his private interests and corporate interests, and by not competing with Preferred Auto or profiting at its expense.

After termination of Key's fiduciary relationship, Key could not use his prior fiducial information contrary to Preferred Auto's interests, nor take with him key personnel to operate a competing enterprise.

Insight contends that the instruction should have stated that Key could not use prior "fiducial confidences" to the detriment of Preferred. Instead, the trial court used the term "fiducial information," which

Insight maintains is meaningless and could have included any information, confidential or otherwise, Key learned while he was a fiduciary. We agree.

A fiduciary is prohibited from using only confidential information that belongs to a former employer. *Aero Drapery*, 507 S.W.2d at 170. "After the termination of his fiduciary relationship ... he may carry with him his personal experience, enterprise, and knowledge, but he may not use prior fiducial *confidences*." *Id.* at 170–71. (Emphasis added). *See also Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189 (Ky.2013); *Davis v. Davis*, 343 S.W.3d 610 (Ky.App.2011); *Stewart v. Kentucky Paving Co.*, 557 S.W.2d 435 (Ky.App.1977). Contrary to Preferred's position, we do not believe that a jury would necessarily interpret "fiducial information" and "fiducial confidences" as being one in the same. The term "fiducial," in and of itself, is vague, and when coupled with "information" becomes far too broad and meaningless. *See DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir.1985) (holding that the district court should have provided the jury with any guidance concerning what the term "fiducial confidence" means.). We are of the opinion that the instruction did not properly inform the jury that Key was only prohibited from using *confidential* information that belonged to Preferred.

We also agree with Insight that Instruction No. 2 erroneously instructed the jury that after the termination of Key's fiduciary relationship with Preferred, he could not hire key personnel employed by Preferred. In fact, the law is that "he cannot, *while still a corporate fiduciary*, set up a competitive enterprise or resign and take with him the key personnel of the corporation for the purpose of operating his own competitive enterprise." *Aero Drapery*, at 169 (emphasis added) (citations omitted). *See also Baptist Physicians Lexington, Inc.*, 436 S.W.3d at 200. ("While Kentucky law is not extensive, it is nonetheless instructive regarding the duties of a corporate director who plans to compete. The conduct alleged by NLC, misuse of corporate information and recruiting of NLC personnel *prior to resignation*, if proven, would support a claim for breach of the Physicians' common law fiduciary duties.") (Emphasis added).

The wording of the instruction herein essentially stated that Key could *never* hire key personnel of Preferred, even after his fiduciary duties ceased. Even accepting as true Preferred's dubious argument that its mechanics were "key personnel," once Key was no longer a fiduciary of Preferred, he was not prohibited from recruiting any of Preferred's employees. See *B & L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 208 (Tenn.Ct.App.2004) ("We therefore find that the trial court properly premised its finding that defendants breached their duties of loyalty to B & L upon defendants' wrongful solicitation of employees Benson and Donnelly prior to their termination or resignation from B & L."). Accordingly, we conclude that Instruction No. 2 erroneously misstated the law regarding breach of a fiduciary duty.

Insight next argues that the trial court's instruction on aiding and abetting a breach of fiduciary duty was erroneous. Instruction No. 3 provided as follows:

### INSTRUCTION NO. 3

If you answered "YES" to Interrogatory No. 1, you will now consider whether Insight Communications is liable for aiding and abetting Jerry Key's breach of fiduciary duty. To find that Insight Communications aided and abetted Jer-

ry Key in breaching a fiduciary duty to Preferred Auto, you must determine that:

(a) Insight knowingly joined with, encouraged, aided or gave substantial assistance in the actions constituting the breach of fiduciary duty; and

(b) Preferred Auto suffered damages.

Indeed, the above-instruction differs significantly from the language of Restatement (Second) of Torts § 876(b) which states:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... (b) knows that the other's conduct constitutes a breach of duty and give substantial assistance or encouragement to the other so to conduct himself.

The Restatement standard clearly requires both (1) knowledge of the breach of fiduciary duty and (2) substantial assistance or encouragement to the fiduciary to breach such duty. *See Miles Farm Supply, LLC,* 595 F.3d at 666. The trial court's instruction, however, combined the requirements and allowed the jury to find for Preferred upon a finding that Insight knowingly joined, assisted or encouraged Key. Contrary to the Restatement, the jury was not required to specifically find that Insight had actual knowledge of Key's alleged breach. The wording is made all the more erroneous because it only required the jury to find that Insight knowingly joined with, encouraged or aided Key, which unquestionably departs from the substantial assistance requirement contained in § 876. Clearly, the law requires that the encouragement, aid or assistance be substantial. *Id.* However, the instruction herein failed to provide the "substantial" qualifier to the relevant actions, and essentially authorized the jury to find that any encouragement, aid, or assistance on Insight's part constituted aiding and abetting. Consequently,

we must agree with Insight that Instruction No. 3 erroneously misstated the law on aiding and abetting a breach of fiduciary duty.

■ Insight also argues that the trial court failed to instruct the jury on the measure of damages. Specifically, Instruction No. 4 provided:

If you have found for Preferred Auto and answered "Yes" to Interrogatories No. 1 and 2, then you may award Preferred Auto such damages as will reasonably compensate it for the losses it has suffered. In awarding damages, you will exclude from the amount of the award so much of Preferred Auto damages as you are satisfied from the evidence could have been avoided through the exercise of ordinary care in attempting to continue its business by seeking new customers.

From the evidence, please set forth the amount of money that will compensate Preferred Auto for Insight's aiding and abetted [sic] the breach of fiduciary duty of Key.

Insight contends that the trial court was required to instruct the jury that it could only award damages that Preferred suffered as a direct result of Insight's aiding and abetting Key's breach.

In the *Baptist Physicians of Lexington, Inc.* decision, our Supreme Court stated:

[I]f NLC establishes a breach of fiduciary duty by any of the Physicians (or aiding and abetting by Baptist) the recoverable damages are those caused by the actual breach of those duties, not some portion of the revenue stream generated by the Physicians through their medical practices after their departure....

. . . .

While quantifying the damages that a corporation incurs when a director im-

properly uses confidential information or hires corporate employees for a competing venture is not an easy task, courts in other jurisdictions have tackled the task. *See, e.g., B & L Corporation v. Thomas and Thorngren, Inc.,* 162 S.W.3d 189 (Tenn.App.2004); *Monotronics Corp. v. Baylor,* 107 Ill.App.3d 14, 62 Ill.Dec. 760, 436 N.E.2d 1062 (1982). When fiduciary duty breaches are proven, Kentucky trial courts and juries are equally capable of making damage causation determinations on a case-by-case basis.

436 S.W.3d at 201. As Preferred points out, the final sentence of the instruction did instruct the jury to award an amount of money that would compensate Preferred for Insight's tortious conduct. Nonetheless, the prior language in the instruction can also be interpreted as allowing the jury to award such damages as would reasonably compensate Preferred for its losses in general, including those unrelated to Insight's alleged tortious conduct. That language, when coupled by improper expert testimony regarding Preferred's lost profits, also discussed in this opinion, certainly could have resulted in the jury awarding Preferred damages for losses that it may have sustained as a result of losing Insight's business but that were not directly attributable to any tortious conduct.

■ Insight next argues that Instruction No. 5 pertaining to apportionment of fault erroneously omitted Southside and Johnson. Insight contends that it introduced sufficient evidence, including Preferred's complaint against Southside and Johnson claiming that Key misappropriated information belonging to Preferred for Southside's benefit and Preferred's demand letter claiming that Key left Preferred to work for Southside, to warrant including Southside and Johnson in an apportionment instruction pursuant to Kentucky Revised Statutes (KRS) 411.182.

■ "If there is an active assertion of a claim against joint tortfeasors, *and the evidence is sufficient* to submit the issue of liability to each, an apportionment instruction is required whether or not each of the tortfeasors is a party-defendant at the time of trial." *Floyd v. Carlisle Construction. Co., Inc.,* 758 S.W.2d 430, 432 (Ky. 1988) (Emphasis added). *See also Savage v. Three Rivers Medical Center,* 390 S.W.3d 104, 118 (Ky.2012). Insight suggests that the decision in *CertainTeed Corp. v. Dexter,* 330 S.W.3d 64 (Ky.2010), stands for the proposition that a complaint filed against a non-party is sufficient to submit an apportionment instruction that includes that non-party party. In fact, however, our Supreme Court in *CertainTeed* held that

> [e]mpty-chair defendants who have settled are to be treated no differently than participating defendants in regard to what must be proved to apportion fault against them. Though the empty-chair defendant will not actually be held liable in the trial, since it is literally not on trial, a participating defendant must still prove liability on the part of the tortfeasor onto whom it seeks to shift some of the blame.

*Id.* at 74. As stated more explicitly in a case in which the instructions improperly allowed the jury to apportion damages to parties without finding them at fault:

> Fault may not be properly allocated to a party, a dismissed party or settling non-party unless the court or the jury first finds that the party was at fault; otherwise, the party has no fault to allocate ... The mere fact that a party has been sued or has settled does not permit the factfinder to allocate part of the total fault to that party.

*Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 471 n. 4, 5 (Ky.2001) (citation omitted); *see also Morgan v. Scott*, 291 S.W.3d 622, 634 (Ky.2009) ("[F]ault may be apportioned only among those against whom the evidence of liability was sufficient to allow submission of the issue of fault to the jury.").

We are of the opinion that Insight failed to meet its burden of proving that Southside and Johnson knew Key owed a fiduciary duty to Preferred or that they provided substantial assistance to Key in breaching that duty. That Preferred stated claims against both does not satisfy Insight's burden of proving their liability so as to shift the blame accordingly.

■ The trial court has the authority to deny requested instructions, and if there is doubt that the evidence supports the giving of an instruction, their decision to do so will only be reversed for an abuse of discretion. *See Olfice Inc.*, 173 S.W.3d at 229; *Nazar v. Branham*, 291 S.W.3d 599 (Ky.2009). Based on the record before us, we cannot conclude that the trial court abused its discretion by excluding Southside and Johnson from the apportionment instruction.

### ERRONEOUS EVIDENTIARY RULINGS

■ Insight first argues that testimony from Preferred's damage expert, James Gravitt, should have been excluded under Kentucky Rules of Evidence (KRE) 702 as it was unreliable and based on assumptions. We agree.

At trial, Gravitt testified that he was bound by the professional standards of the American Institute of Certified Public Accountants ("AICPA"). Gravitt explained that the AICPA Practice Aid on Calculating Lost Profits requires a link between the wrongful act and the resulting damages. Gravitt stated that he calculated

Preferred's damages as being $4,340,000, which represented its lost profits from the time Insight ceased doing business with Preferred until Brian Payne's forecasted retirement date in 2022. However, during his testimony, Gravitt acknowledged that he included in his calculations any monies that Insight spent at vendors other than Preferred and Southside, including completely unrelated body, tire and towing work that Preferred had not previously performed for Insight. When questioned, Gravitt was unable to identify a causal link between that other work and Preferred's damages. In fact, Gravitt conceded that his damages estimate would be greatly reduced if monies representing Insight's lawful conduct unrelated to the alleged tortious conduct were excluded. We must agree with Insight that the damage model presented to the jury sought to hold Insight liable for damages that had no relationship to the claims asserted by Preferred.

■ Further troubling is the fact that Gravitt specifically acknowledged that Insight did not have a contract with Preferred and was free to move its business to another vendor at any time, yet calculated his damages using Payne's proposed retirement date of 2022 because "it seemed to be a reasonable time period." Loss of anticipated profits is a recognized form of damages in Kentucky if proven with a reasonable certainty. *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky.1985). *Kentucky Utilities Co. v. Warren Ellison Café*, 231 Ky. 558, 563, 21 S.W.2d 976, 978 (Ky.1929). Although the "[m]ere uncertainty as to the amount will not preclude recovery[,]" *Illinois Valley Asphalt, Inc. v. Harry Berry, Inc.*, 578 S.W.2d 244, 245 (Ky.1979), more than a mere estimate is required. Further, there must be "no lack of certainty on account of being too remote, conjectural, and specula-

tive." *Kentucky Utilities Co.*, 21 S.W.2d at 978.

Preferred has produced no evidence, and we find none in the record, to indicate that Insight would have stayed with Preferred after Key's departure. Significantly, the parties did not have a contract. Further, there seems to be no dispute that Insight and Preferred's business was premised upon Key's relationship with Insight employees. Thus, there is a distinct possibility, if not probability, that Insight would have chosen to maintain its relationship with Key and forsaken its business with Preferred even absent any alleged wrongful conduct. *See B & L Corp.*, 162 S.W.3d at 220; *Baptist Physicians Lexington, Inc.*, 436 S.W.3d at 201. ("Patients ... can and do choose from whom they will receive their medical care. The patients that have been the subject of much dispute in this case did not belong to NLC and they do not belong to the Physicians and Baptist, a fact that should not be lost on any of the parties on remand.").

Gravitt's expert testimony that he believed Insight would continue to do business with Preferred until 2022 was based on nothing more than pure speculation and conjecture. Consequently, his calculation of lost profit damages was unreliable and should have been excluded.

■ Next, Insight argues that the trial court erred in allowing a Preferred employee, Barbara Hargrove, to testify that, while he was still employed with Preferred, Key gave her $10,000 to obtain two $5,000 gift cards from L&N Credit Union so that he could give one of them to "Bob." Hargrove stated that she assumed Bob was Bob Mathena of Insight. Insight contends that Hargrove's testimony was hearsay, irrelevant and prejudicial.

■ We agree with Insight that, contrary to Preferred's argument, the hearsay

exception contained in KRE 803(3) for a declarant's state of mind is inapplicable. Key's state of mind concerning his alleged intent to give Mathena a gift card at a point in time well before he was terminated was simply not an issue in the case. However, we are more troubled by the fact that Insight was prohibited from calling an L&N representative or introducing a certified business record to establish that the bank had a maximum limit on gift cards of $1,000. Hargrove's testimony was demonstrably false and the trial court's prohibition of any rebuttal evidence proving such was clearly erroneous.

### CROSS-APPEAL

■ In its cross-appeal, Preferred first argues that the trial court erred in denying its motion to amend its complaint to add claim for a violation of the Kentucky Uniform Trade Secrets Act ("KUTSA"), KRS 365.880 et seq. Preferred contends that in denying the motion, the trial court engaged in an improper and incorrect analysis of the merits of the claim when it ruled that "no information identified by [Preferred] constitute[ed] a trade secret as defined by KRS 365.880(4)." We disagree.

■ CR 15.01 provides that, with exceptions not applicable here, "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *See also Nichols v. Zurich American Ins. Co.*, 423 S.W.3d 698 (Ky.2014). In *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 869–70 (Ky.App.2007), a panel of this Court explained:

> In determining whether to grant a motion to amend a party's complaint, a circuit court "may consider such factors as the failure to cure deficiencies by amendment or the futility of the amendment itself." *First National Bank of*

*Cincinnati v. Hartman,* 747 S.W.2d 614, 616 (Ky.App.1988). Other factors include whether amendment would prejudice the opposing party or would work an injustice. *See Shah v. American Synthetic Rubber Corp.,* 655 S.W.2d 489, 493 (Ky.1983).

A trial court may deny the right to amend a pleading on the basis of "the futility of the amendment itself," which essentially equates to a failure to state a claim upon which relief could be granted. *Bank One, Kentucky, N.A. v. Murphy,* 52 S.W.3d 540 (Ky.2001). Ultimately, a trial court is vested with the discretion to determine whether to allow an amended pleading, and its decision will not be disturbed absent an abuse of that discretion. *Lambert v. Franklin Real Estate Co.,* 37 S.W.3d 770, 779 (Ky.App.2000).

■ KRS 365.880, the statute wherein Kentucky codified the Uniform Trade Secrets Act, provides in relevant part:

(4) "Trade secret" means information, including a formula, pattern, compilation, program, data, device, method, technique, or process, that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Information cannot constitute a trade secret and, thus, is not confidential if the subject matter is "of public knowledge or general knowledge in the industry" or if the matter consists of "ideas which are well known or easily ascertainable." *Heyer–Jordan & Associates, Inc. v. Jordan,* 801 S.W.2d 814, 821 (Tenn.App.1990) (quoting *Hickory Specialties v. B & L Labs., Inc.,* 592 S.W.2d 583, 586–87 (Tenn. App.1979)).

We agree with the trial court that there is simply nothing in the record to satisfy the statutory definition of a trade secret. In its tendered amended complaint, Preferred alleged that Key acquired and misappropriated "certain proprietary and confidential trade secret information belonging to Preferred Automotive relating to its operations, pricing, business arrangements, suppliers, customers, parts warranties and vehicle repair histories." As we previously concluded, however, it is questionable whether the information at issue is even confidential much less trade secrets. Preferred did not derive any "independent economic value" from its knowledge of Insight's vehicles. Preferred profited simply because Insight chose to have its fleet maintained by Preferred. Furthermore, Insight certainly had the right to share with any other vendor it chose for service the repair and maintenance histories, as well as the parts and price charged for them.

■ In *Venture Express, Inc. v. Zilly,* 973 S.W.2d at 606, the Court stated that

[i]n the absence of evidence to the contrary, this court has held that the following types of information are not confidential:

(1) Remembered information as to a business's prices;

(2) The specific needs and business habits of certain customers; and

(3) An employee's personality and the relationships which he has established with certain customers.

*See also B & L Corp.,* 162 S.W.3d at 213 (names of customers, the prices charged for services rendered, the renewal dates for customer contracts, and the name of the customer contact person authorized to enter into binding contracts is not confi-

dential simply "because it can be difficult to obtain."). Finally, as the Pennsylvania Supreme Court recognized in *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 776 (1965) "material sources and costs" are "something that would be learned in any productive industry, . . . ." *See also SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244 (3rd Cir.1985).

We are of the opinion that even if the factual allegations of the amended claim were taken as true, Preferred would not have been entitled to any relief for a violation of the KUTSA because the information it alleges Key to have acquired and misappropriated does not satisfy the definition of a trade secret under KRS 365.880(4). We conclude that the trial court properly found that it would have been futile for Preferred to amend its complaint and, as such, denied the motion accordingly.

Preferred next argues that the trial court erred by including itself and Key in the apportionment instruction. Specifically, Preferred contends that apportionment of fault is only permitted among parties in *pari delicto*, and that it cannot share fault in the breach of fiduciary duty since the beneficiary of a fiduciary duty cannot be in *pari delicto* with the fiduciary who breaches the duty. Further, Preferred argues that apportionment to Key was improper because Insight and Key were joint and severally liable pursuant to *Steelvest, Inc. v. Scansteel Service Center*, 807 S.W.2d 476, 485 (Ky.1991). We find both of Preferred's arguments to be without merit.

KRS 411.182, Kentucky's comparative fault statute provides, in relevant part:

(1) In all tort actions, including products liability actions, involving fault of more than one (1) party to the action, including third-party defendants and persons who have been released under subsection (4) of this section, the court, unless otherwise agreed by all parties, shall instruct the jury to answer interrogatories or, if there is no jury, shall make findings indicating:

(a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and

(b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under subsection (4) of this section.

(2) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

(3) The court shall determine the award of damages to each claimant in accordance with the findings, subject to any reduction under subsection (4) of this section, and shall determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault.

With the adoption of comparative fault, the trier of fact is required to consider the conduct of *all* of the parties, including claimants such as Preferred, and to determine the percentage of total fault of those parties. "Fault" has been defined to include an "unreasonable failure to avoid an injury or to mitigate damages." *Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d at 473 (quoting Uniform Comparative Fault Act, 12 U.L.A. 123, note 10 at § 1(b) (Cum.Supp.2000)).

Preferred's argument that apportionment can only be among parties in *pari delicto* is misplaced. In fact, the

concept of *pari delicto,* as it is applicable herein, refers only to whether a joint tortfeasor is entitled to apportionment or indemnity. In *Degener v. Hall Contracting Corp.,* 27 S.W.3d 775 (Ky.2000), the Kentucky Supreme Court explained the circumstances in which a defendant has a right to apportion liability and when its right is to indemnity. Apportionment of liability arises "when two or more joint tortfeasors are guilty of concurrent negligence of substantially the same character which converges to cause the plaintiff's damages." *Id.* at 778. Such joint tortfeasors "are said to be 'in *pari delicto.*'" *Id.* Indemnity, on the other hand, "is available to one exposed to liability because of the wrongful act of another with whom he/she is not in *pari delicto.*" *Id.* at 780. In either case, however, whether the joint tortfeasors are or are not in *pari delicto* has no bearing whether fault can be apportioned to a plaintiff.

■ Further, contrary to Preferred's argument, liability among joint tortfeasors is no longer joint and several, but is several only. *Dix & Associates Pipeline Contractors, Inc. v. Key,* 799 S.W.2d 24 (Ky. 1990). Thus, because the liability is several as to each joint tortfeasor, it is necessary to apportion a specific share of the total liability to each of them, whether joined in the original complaint or by third-party complaint, and the several liability of each joint tortfeasor with respect to the judgment is limited by the extent of his/her fault. *Id.* at 27–28. *Degener,* 27 S.W.3d at 779.

Preferred erroneously contends that the recent decision in *Abbott v. Chesley,* 413 S.W.3d 589 (Ky.2013), supports joint and several liability for breach of fiduciary duty. In fact, our Supreme Court specifically recognized that joint and several liability is barred in tort cases by KRS 411.182, but nevertheless determined that the appellants' claim was essentially contractual, based upon a breach of the attorney-client contract, and further that the appellees had engaged in a joint enterprise, or joint adventure, for which joint and several liability is properly assessed pursuant to KRS 362.220. *Id.* at 603. *Abbott* has no applicability to the instant case.

Based upon the language of KRS 411.182 and the cases interpreting comparative negligence, we conclude that the trial court did not err by instructing the jury to apportion fault to Preferred and Key.

Both parties have appealed the award of punitive damages. Insight argues the punitive damages award must be vacated because there was no clear and convincing evidence that it acted with fraud, oppression, malice or gross negligence. KRS 411.184(2); *Williams v. Wilson,* 972 S.W.2d 260 (Ky.1998). Insight further contends that once the trial court ruled that the punitive damage award was the result of passion or prejudice, it was required to vacate the award rather than arbitrarily reduce it. In its cross-appeal, however, Preferred argues that the full punitive damage award should be reinstated because the trial court lacked the authority to reduce it and because the trial court erred in finding that it was the result of passion or prejudice. Because we are remanding this matter for a new trial, however, any issues regarding the punitive damages award are necessarily rendered moot. For the same reason, we decline to address Insight's arguments pertaining to the closing arguments.

For the reasons set forth herein, the judgment of the Jefferson Circuit Court is reversed and this matter is remanded for a new trial in accordance with this opinion.

ALL CONCUR.