**FANNON v. CARDEN et al.**

Court of Appeals of Kentucky.
June 1, 1951.

H. M. Brock & Sons, Harlan, for appellant.

Smith & Shehan, Harlan, for appellees.

MOREMEN, Justice.

On October 9, 1946, appellant, B. D. Fannon, leased a coal mine from O. J. Bailey for the sum of $100, which lease covered 25 acres of land located on the Harlan-Hyden highway in Harlan county. On November 9, 1946, appellant entered into a contract with appellees, John Carden, W. A. Harris, and Boyd Garrett, who were doing business under the trade name of Beech Fork Coal Company, by the terms of which appellant conveyed his right, title, and interest in said lease to appellees and also sold and conveyed to them his title and interest in and to mine equipment located upon the leased premises. In consideration of the assignment appellees paid to the assignor the sum of $1000 in cash and executed a promissory note in

the principal sum of $1000 payable twelve months after date. On June 24, 1947, appellant filed suit in the Harlan Circuit Court under Sec. 237 of the Civil Code of Practice, in which he prayed judgment against appellees for the sum of $1000 as evidenced by the promissory note above mentioned. Appellees filed answer and counterclaim which contained a traverse and an allegation that the promissory note sued on was not due or payable until November 9, 1947, and which, in the third paragraph, alleged in substance that at the time appellees entered into the contract, appellant falsely and fraudulently represented to them that the land covered by the said lease contained a seam of marketable coal 6½ feet in height, contained no dirt or rock, and was marketable coal which could be mined at a profit. It was further alleged that they relied upon these representations which were false and which were known by the appellant to be false and thereafter, while still relying upon representations made by appellant, they erected a coal tipple on the land, purchased steel and placed it in said mine, constructed a building on the leased premises and expended time, labor, and money for the purpose of operating the coal mine, and that thereafter they discovered that the coal on the leased land was not marketable and by reason thereof they were damaged in the sum of $5000. In the answer and counterclaim it was also stated that appellees had received from appellant under the contract certain material of the reasonable value of $236 which they tendered back to plaintiff. The prayer of the answer and counterclaim requested that the writing of November 9, 1946 be cancelled and held for naught and they further prayed judgment against appellant for the sum of $5000 subject to credit for the reasonable value of the mine equipment which they had obtained from the appellant. Proof was taken and the cause was submitted to the circuit court on the pleadings, proofs and exhibits, and judgment was entered whereby it was decreed that the written contract dated November 9, 1946, and the promissory note of even date were cancelled and set aside, and it was further adjudged that the ap-

pellees recover on their counterclaim the sum of $4436.42, subject to a credit of $458.92. The appellant contends that (1) he did not falsely represent the quality of the coal; (2) the alleged misrepresentation of the quality of the coal does not make appellant liable to appellees in damages because the maxim of caveat emptor applies, and (3) the damages found by the chancellor were erroneous, miscalculated and excessive.

The record discloses that prior to the time appellant leased this mine from Bailey, an opening had been driven into the mountain for the depth of about 100 feet and that at the time negotiations were being conducted, which culminated in the assignment of the lease here involved, this opening contained water which made it difficult to reach the face of the coal at the end of the shaft. After he had obtained the lease from Bailey, appellant scraped the dirt from an outcropping of the seam with a bulldozer for the distance of about 50 feet for the purpose of starting a new entry for the same seam. Two of the appellees visited the mine with appellant and there viewed the premises. The face of the outcropping of coal contained three streaks of dirt. Appellee Carden testified that appellant Fannon assured them that he had measured the face of the coal in the old entry and there the seam was 42 inches in width and there was but one streak of dirt in it which he represented to be no more than the thickness of his finger. He stated that he did not examine the seam himself because the old entry was filled with water. Appellee Harris, who also was present, corroborated this testimony and stated that he told Fannon that the coal was full of dirt and Fannon had replied that he had been back to the face of the opening and that the width of the coal there was 40 to 42 inches of clean coal with but one small streak of dirt. This testimony is denied by the appellant who stated that he had never been back in the old mine himself and that he made no representations about the condition of the coal at the face of the old opening. There is other testimony that tends to support both sides of this controversy.

After appellees signed the contract they began to drive a new opening into the mountain from the point where the outcropping had been exposed by removing the dirt with the bulldozer and after they had mined approximately 15 feet from the new opening, the seam had not changed in appearance, the dirt being plainly visible. However, they continued to excavate for a distance of about 130 feet although, after they had driven the entry only about 30 feet, they cut through to the old opening, drained the water, and exposed the face of the coal at the old opening which contained a seam only 35 inches thick and which had three or four streaks of dirt and shale which was described by an engineer to be as follows: "We have blue slate roof or top 2½ inches of coal, 1½ inches of rock, 4½ inches of coal, 1 3/25 inches of dirt and shale, 3 1/25 inches of coal, 3 1/25 inches of dirt and shale, 3½ inches of coal, 1 3/25 inches of shale and dirt, 13 inches of coal with blue slate bottom, that is section of coal that we found over there."

Appellant contends that because no fiduciary relation existed between him and the appellees and since the appellees had ample opportunity to view the coal mining properties before they purchased the assignment, the doctrine of caveat emptor applies and appellees were not entitled to rely on any representation as to the quality of the coal underlying the leased premises.

As a general rule where no direct representation is made by the vendor concerning definite facts and the purchaser has sufficient opportunity to observe the condition of the premises, the maxim of caveat emptor is applicable, but the facts here present a different case. The appellant did not merely give an estimation or an opinion of his own concerning the quality of coal. If the testimony of appellees' witnesses is accepted as true, he made a definite, positive statement that he had visited the face of the seam at the end of the old entry and there found the coal to be in good condition. In Black on Rescission and Cancellation (2nd Ed.) Sec. 426, it is said: "False representations by the vendor as to the existence, quantity, or quality of valuable minerals said to underlie the surface furnish ground for rescission by the purchaser, if direct and positive assertions of fact and if justifiably relied on by him. Such, for instance, is a statement as to the quantity of coal which has been taken from a coal mine on the premises within the preceding year."

We are of opinion that there is a clear preponderance of evidence to the effect that appellant made direct and positive representations concerning the quality of the coal at the end of the old shaft from which the chancellor properly might conclude that appellant knowingly made them and that they were in good faith relied upon by appellees before the contract of lease was made, and, in such a situation, we are not inclined to disturb his judgment insofar as it rescinds the contract and cancels the note sued upon. Combs v. Combs, 307 Ky. 790, 212 S.W.2d 307.

Appellant further contends that if it is decided that a misrepresentation was, in fact, made, the injured parties must take those steps which are necessary to minimize the extent of the injury.

It is well to remember that after the contract of November 9, 1946 was executed and appellees took possession under its terms, appellant lost all control over the property and had no means by which he could control or in any way influence the actions of the appellees. They were free to select any method of operation that suited their fancy. Their perceptions of businesslike caution were their own. Appellant had no control over the expenditures to be made or the methods to be used in developing the seam of coal.

Appellees had excused themselves from the impact of application of the doctrine of caveat emptor by accepting and relying on the statements of appellant but, after entering the premises and commencing operation of the mine, they were charged with the duty of prudent procedure in its development and, if they failed in this duty and suffered damages thereby, the loss should be charged to them alone.

The appellees, as stated above, were not charged with the duty to examine the face of the seam in the old entry because it was

filled with water. They had no control of the property and were entitled to believe and rely on the statements of appellants but, after they commenced operations, it was time for self-reliance. It would have been a simple matter for appellees to drain the water out of the old entry and view the face of the seam. Appellee Harris testified:

"Q. 21 How long would it have taken you to let that water out? (Defendant objects.) A. I guess three or four hours or five. I don't know how long.

"Q. 22 It would have been a matter of a short time to let that water out? A. Four or five hours.

"Q. 23 How long did you work up there before you found this coal at the face of the entry was dirty? A. I will say we were in there a month.

"Q. 24 You worked there a month in order to get to the face of this other seam? A. Yes; we built a shute.

"Q. 25 In four or five hours, you could have dug a ditch and let the water run out and looked in the mine? A. I took Mr. Fannon's word, Mr. Fannon could have said 'Boys, I will go in there with you.' * * *

"Q. 47 How much would it have cost you to have some man dig a ditch there to drain that water out? A. We didn't do that.

"Q. 48 How much would it have cost? (Defendant objects.) A. Ten dollars.

█ Appellee Carden in testifying about operations after their assumption of control of the premises stated: "When we got started in the new opening, we drove approximately thirty feet, and when we got in 15 feet, about three streaks of dirt showed up on the outside but when we got inside, there come another one about fifteen feet, about two inches or better from the top, and that made four streaks of dirt. We turned to the left and out a breakthrough from the new opening; we were driving into the old opening, and drained the water out; then we went to the face of the old opening, and four streaks of dirt just like a layer cake. It was streaks of dirt."

It is apparent from the above statement that the condition of the coal had not changed after the shaft had been driven 15 feet and we assume from said statement that it was only necessary to drive 30 feet into the old opening. He testified as follows:

"Q. 22 How far were the two openings apart? A. Approximately 20 feet.

"Q. 23 Where was the opening driven, 130 to 150 feet? A. 130 to 150 feet."

So it would appear that after having driven only about 30 feet and having connected the new opening with the old opening, they continued to drive the new opening at least 100 feet, during all of which time the quality of the coal did not improve. In the case of Raleigh v. Clark, 114 Ky. 732, 71 S.W. 857, 859, the court quoted with approval from Sedgwick on Damages, this rule: "It is frequently said that it is the duty of the plaintiff to reduce the damages as far as possible. It is more correct to say that by consequences, which the plaintiff acting as prudent men ordinarily do, can avoid, he is not legally damaged. Such consequences can hardly be the direct or natural consequence of the defendant's wrong, since it is at the plaintiff's option to suffer them. They are really excluded from the recovery as remote."

In view of the fact that appellees could have ascertained the true quality of the coal in the old entry in a few hours by the simple process of digging a ditch through the bank slide which had dammed the water in the entry, we are of opinion that the damages resulting from the expense of driving, on their own volition, the new entry are remote and are not the natural consequence of appellant's wrong.

█ This case has presented difficulties because appellees in their counterclaim combined, without objection, a suit for cancellation of the contract and the note executed thereunder with a suit for damages for false representation but, since we have indicated that such damages were not the

direct result of appellant's misrepresentation, it is necessary to determine what judgment should be entered upon rescission of the contract. Ordinarily a judgment for the cancellation or rescission of a contract does not involve the claim or award of compensation to the injured party on account of fraud or other vice and it usually involves only the undoing of the contract— the making of it as if it had never been— and the parties are entitled to demand and recover from the other whatever was paid as consideration of the contract, making allowance for corresponding demands on the other side. In the case at bar we have been unable to determine from the record the exact method used by the court in entering the judgment for damages but we believe that justice may be done by awarding to appellees judgment in the sum of $1000 heretofore paid by them in cash to appellant, cancellation of the $1000 note, subject to an offset of the reasonable value of the property which appellees received from appellant at the time the contract was consummated.

Wherefore the judgment is affirmed in part, reversed in part, and the case remanded for proceedings not inconsistent with this opinion.