RENDERED: JANUARY 9, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0882-MR

GARY GATCHEL                                         APPELLANT

v.                   APPEAL FROM TRIGG CIRCUIT COURT
                  HONORABLE JAMES R. REDD, III, JUDGE
                  ACTION NO. 12-CI-00219

TERRY OPELL AND NANCY OPELL                    APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND A. JONES, JUDGES.

JONES, A., JUDGE: Gary Gatchel appeals from the Findings of Fact, Conclusions of Law, and Judgment After Bench Trial entered by the Trigg Circuit Court on April 22, 2024. This matter arises out of Gatchel's purchase of a residential property in Cadiz, Kentucky, near Lake Barkley. Gatchel asserts that the sellers, Terry and Nancy Opell ("the Opells"), misrepresented several material aspects of the property when completing the statutory seller's disclosure form.

Following a bench trial conducted pursuant to CR[1] 52.01, the trial court entered a judgment in favor of the Opells and dismissed Gatchel's claims with prejudice. On appeal, Gatchel maintains that the trial court's judgment is contrary to the evidence and misapplied Kentucky law regarding fraud in real estate transactions. Having reviewed the record and being otherwise sufficiently advised, we affirm.

## I. BACKGROUND

This case concerns the sale of a lakeside property located at 59 Shore Drive in Cadiz, Kentucky, situated on the shore of Lake Barkley. The Opells purchased the property on June 12, 1999. At that time, it consisted of three undeveloped lots—Lot 36E and Lots 37E and 38E—in the Woodland Hills Subdivision. The property runs from Shore Drive down towards the water and is characterized by steep, rocky terrain and natural ravines typical of the area.

During their ownership, the Opells improved the property by placing two manufactured homes on the lots. One of those homes was occupied by Max and Annette Bell, who lived there full-time. The Bells paid rent to the Opells and shared utility expenses, including electric service.[2] The Opells used the second trailer as a seasonal residence. They described themselves as "weekenders,"

---

[1] Kentucky Rules of Civil Procedure.

[2] After Max Bell passed away, Annette continued living in the trailer alone for a period of time.

visiting primarily during warmer months and never residing on the property full-time.

In anticipation of selling the property, the Opells completed the Seller's Disclosure of Property Condition form ("Seller's Disclosure") on September 18, 2007. The form reflects their representations, as lay homeowners, about the condition of the property based on their personal knowledge and experience during their ownership and occupancy.

On September 23, 2007, Gatchel and his friend, Carol Martin, traveled from Illinois to search for recreational property in the Lake Barkley region. After viewing the Opells' property, they returned to Illinois and contacted a realtor the following day. The realtor provided them with the Opells' Seller's Disclosure and a proposed land purchase agreement. Gatchel and Martin signed the disclosure form acknowledging receipt on September 25, 2007. Ultimately, they offered $65,000 for the property, and the Opells accepted their offer on September 25, 2007. The closing occurred on October 19, 2007.[3]

After the purchase, Martin became the primary occupant of the trailer that had formerly been used by the Opells. Gatchel intended to use the property

_____

[3] At trial, Gatchel appeared to distance himself from the decision to purchase the property, characterizing it as motivated largely by Martin and described it as "her baby." Whether or not that is so, he voluntarily executed the purchase contract and assumed joint ownership. The interpersonal dynamics between Gatchel and Martin are not material to the issues on appeal, and there is no evidence that the Opells were aware of or involved in those private considerations.

recreationally but did not visit during Martin's occupancy due to tension in their relationship. In June 2009, when Martin sought to sell her interest, Gatchel purchased her one-half share and became the sole owner.[4]

After acquiring Martin's interest, Gatchel began visiting the property with greater frequency. He traveled from Illinois and stayed at the trailer intermittently, usually for several days at a time, and he acknowledged that this was the first period during which he personally observed the property's condition. Until then, he had relied on Martin, who was the primary occupant, to inform him of any problems, and she had not reported any significant issues during her time there.

Once he began staying on the property himself, Gatchel identified several conditions he believed had been improperly disclosed or concealed by the Opells. These included a roof leak, the presence of wasps inside the trailer, drainage and erosion along the hillside, concerns related to a boat dock, and questions about the septic or "wetland" system that had been installed during the Opells' ownership. Gatchel eventually concluded that these conditions rendered

---

[4] Gatchel testified that when Martin later decided to sell her one-half interest in the property, he paid her $40,605.68, an amount he believed exceeded her actual equity, because she threatened to pursue litigation if he refused. Whatever the merits of that dispute, the Opells were not involved in the subsequent transfer of Martin's interest, and the circumstances of that 2009 transaction have no bearing on whether the Opells misrepresented the condition of the property at the time of the 2007 sale. Suffice it to say, however, that Gatchel testified that he was not aware of any problems with the property when he bought Martin's interest in 2009.

the property unsafe, and he attributed them to what he considered intentional inaccuracies or omissions in the Opells' 2007 Seller's Disclosure.

On September 13, 2012, Gatchel filed this action alleging fraud, misrepresentation, and failure to disclose material defects. The litigation that followed was extensive. The parties engaged in years of written discovery, depositions, expert disclosures, and pretrial motion practice. Numerous continuances were granted due to health issues, attorney changes, and disputes regarding the admissibility of certain evidence. Mediation efforts were unsuccessful.

Over a decade after the action was commenced, the trial court held a bifurcated bench trial on October 9 and December 15, 2023. The first phase addressed liability, with a second phase on damages to be conducted if necessary. During the liability phase, the trial court heard testimony from Ronald Brown, a neighboring property owner; Bridget Tharp, a Health Environmentalist II with the Pennyrile District Health Department; and Gatchel himself. Terry and Nancy Opell also each testified on their own behalf. The court also considered deposition testimony from Needa Brown and James Mack Brame, along with photographs, repair invoices, correspondence, health department records, and other documentary evidence concerning the alleged defects.

Ronald Brown, a Shore Drive resident and Gatchel's neighbor, testified first. Brown has lived at 71 Shore Drive since 1999 and was the only full-time resident in that immediate area. From time to time, he assisted both the Opells and later, Gatchel, with property maintenance. Brown testified that when it rained, water drained between his trailer and Gatchel's. He also observed ruts underneath the Bell trailer. Brown explained that these ruts were not visible from the front of the trailer but could be seen from the back. He further testified that he once helped Terry Opell repair the wet cell septic system by assisting in the replacement of one of its corners. Brown did not otherwise maintain or repair the system and stated that no one had complained to him about problems with it. He also helped construct a concrete trough on the property to divert water, although he acknowledged that the trough was not well built.

Bridget Tharp, a Health Environmentalist II with the Pennyrile District Health Department, testified about the Opells' 1999 application for a septic system and about septic and wet cell systems generally. She explained that obtaining approval for a septic system requires a site evaluation, during which a health department representative visits the property, evaluates the soil, and determines an appropriate system design. Once the design is approved, the installer purchases a permit to begin construction, and the health department then performs a final evaluation after installation is complete.

Tharp did not personally perform the Opells' site evaluation. Instead, she reviewed their 1999 application, which had been conducted by Francine Teeters, who has since passed away. Teeters evaluated lots 36E, 37E, and 38E. Lots 37E and 38E received an overall grade of unsuitable. For those lots, Teeters recommended adding fill soil and waiting one year before conducting a new evaluation. Lot 36E, however, received a grade of "provisionally suitable," meaning it could be made appropriate for a system with a pretreatment upgrade. Teeters suggested a wet cell system as an alternative for that lot.

Tharp explained that wet cell systems require aquatic plants, such as water lilies or cattails, for proper operation because the plants assist with evaporation and absorption. She testified that without plants, a wet cell system will fail.

Tharp also testified that, for reasons unknown, the permit to begin construction of the wet cell system was issued for lots 37E and 38E despite their original grade of unsuitability. She acknowledged that either the permit applicant, Jeff Oates, or a health department representative could have mistakenly switched the lots. In reviewing the department's records, Tharp was unable to locate any documentation approving the construction of a septic system on lot 37E or any record of final approval for the installed system.

Tharp also noted that when the Opells applied for the wet cell system, they signed documents acknowledging that they would be responsible for the upkeep and repair of the system. She further testified that she found no records indicating that the health department had ever noted any problems with the system during the time the Opells owned the property.

Gatchel testified next. He stated that it was Martin's idea to purchase property on Lake Barkley, although he eventually became excited about owning lakeside property. Martin lived full-time on the property for a period before she vacated it, and she did not report any problems with the property during that time. Gatchel testified that nothing he saw during his first tour of the property caused him concern, and he did not notice any issues during his early visits. He explained that he did not visit the property at all while Martin lived there, but after purchasing her one-half interest, he visited the property every other month to every third month. He did not visit during the winter. He testified that he first began noticing rutting in the driveway during his first spring visit.

Gatchel testified that he relied on the Seller's Disclosure when deciding to purchase the property and assumed it had been completed accurately. He stated that he later realized it was not accurate. Gatchel complained that one bedroom in the trailer became infested with wasps, and he also reported leaks in the ceiling. The Seller's Disclosure stated that the roof had been repaired and had

not leaked for three years. According to Gatchel, that was not consistent with his experience, although he presented no other evidence of any roof leak. He also complained of issues with the boat dock spud poles, which he first noticed approximately two years into his ownership.

After becoming the exclusive owner, Gatchel contacted Terry Opell by email to learn more about the septic system and how to maintain it. He testified that this was when he first learned the system was a wet cell system. He also stated that the system emitted an odor. Gatchel explained that the driveway was initially gravel and that rain washed the gravel into the septic system. He later installed a cement driveway, which improved the rutting but caused water to flow down the parking area more quickly. To divert the water, he placed cinder blocks and black tubing along the driveway, which he believed to be effective. Gatchel testified that he felt he was "fighting Mother Nature" in his efforts to address erosion on the property. He stated that the Bells had never complained about issues with the septic system or the driveway.

Finally, the Opells testified. Terry Opell testified first. He and his wife, Nancy, live in Indiana and considered themselves weekenders. In the warmer months, they visited the property every weekend. They ultimately sold the property because their health had deteriorated.

Terry testified that when they purchased the property, it was vacant. They used general contractors to perform the construction work and hired Jim Oates to install the septic (wet cell) system. Terry did not perform any of the septic installation work himself, although he was aware that the health department had recommended a wet cell system. He never saw anyone from the health department at the property, and no one informed him that any part of the installation was improper. At one point, they were told they would not receive water service until the health department approved the system. Because they were permitted to connect to water service, they assumed that approval had been granted. Terry testified that he was instructed to add Rid-X or a similar product to the system every two weeks and that water plants were required. He stated that Nancy handled the gardening.

Terry testified that he never experienced erosion "problems." On occasion, water would create small depressions around rocks, but smoothing them out resolved the issue. He testified that they never experienced the issues Gatchel described. According to Terry, any water on the property drained behind the trailers into a natural ditch or ravine. He opined that drainage problems began only after Gatchel installed a concrete driveway, which caused water to flow more rapidly and run under the trailers. Terry further testified that they never experienced drainage issues, never had problems with the septic system, and that

the Bells, who shared the septic system as well as water and satellite expenses, never complained of any problems. Terry also testified that they treated for wasps only about three times and that they regularly slept in the bedroom Gatchel later claimed was infested. He described the wasp issue as minor. He also testified that they had no issues with the boat dock.

Nancy Opell testified that she joined Terry at the property every other weekend. She received the list of recommended water plants for the wet cell system and testified that she planted them each spring. She stated that they only performed normal property maintenance. After heavy rain, small ruts would appear in the driveway, which they would rake out, but she considered these occurrences minor. Although Ronald Brown testified that the road washed out during the aftermath of Hurricane Katrina, Nancy disagreed and stated they did not experience problems. Nancy also testified that before closing, Martin and Gatchel had visited the property. Gatchel remained in the vehicle, but Martin entered the trailer. Nancy stated that she informed Martin about the need to use Rid-X and to maintain the required plants.

Finally, the trial court reviewed two depositions. The first was the deposition of Needa Brown. Ms. Brown was Ronald Brown's mother and had resided with him on Shore Drive before her passing prior to trial. Ms. Brown testified that the land in the area was very steep and, in her opinion, not suitable for

-11-

building. She stated that the property did not wash a lot, but when it rained, water ran off the road "pretty good." She recalled one occasion when a large mud puddle developed from runoff. Ms. Brown testified that the Opells brought in approximately two hundred loads of fill dirt. She also stated that she did not believe there were plants in the septic system.

The second deposition was that of James Mack Brame, a septic system installer who testified that he had installed approximately four thousand septic systems during his career. He had visited the Gatchel property twice. Brame testified that, upon his first visit, it was clear to him that there would be issues with the septic system, although those issues would not be apparent to a layperson. He reasoned that because someone had signed off on a permit after backhoe digging, that person must have observed soil suitable for the required depth of forty-two inches with no restrictions. He testified that he was struck by the erosion on the property, which he attributed to the steepness of the site and the lack of any diversion system for water. In his opinion, the system should have been installed so that water did not flow off the hill into the wet cell. He also believed the system should have been enclosed with an eight-foot fence to prevent deer from traveling through it. Brame further testified that a wet cell system is not ideal for a location where no one resides full-time.

Brame opined that Francine Teeters had checked a box indicating that the final installation was approved. He believed that the continuous installation report form in the health department file was actually a final report and that Teeters should not have signed and dated it. According to Brame, the health department could not have approved the system without an on-site visit. He also testified that a water permit would only have been issued in reliance on Teeters ensuring the system was installed properly. As to the odor described by Gatchel, Brame testified that odors may have various causes, including the condition of the water plants, the time of year, or whether the plants were dormant. He acknowledged that it would be difficult for a layperson to understand everything involved in a properly completed septic system.

Following the liability phase of the bifurcated bench trial, the trial court found that Gatchel failed to prove any claim of fraudulent misrepresentation or fraudulent omission by clear and convincing evidence. The court determined that the Opells believed their property to be in good condition during their years of ownership and that their disclosures accurately reflected their experience. The court noted that neither the Opells nor the Bells, who shared the wetland septic system, reported problems with drainage, erosion, or septic function. Likewise, Martin resided on the property after the sale without complaint, and Gatchel later

-13-

purchased her interest at an increased price, which the court viewed as inconsistent with his present allegations of known defects at the time of sale.

The court found no evidence that the Opells knowingly misrepresented or concealed information related to wasps, roof leaks, or the boat dock. Any issues with the dock appeared years after the sale. As to the wetland septic system, the court concluded that any deficiencies stemmed from the health department's permitting and oversight rather than from any conduct or knowledge of the Opells. With respect to erosion and drainage, the court found that these conditions were readily observable and discoverable through ordinary diligence.

Based on these findings, the trial court entered judgment in favor of the Opells and dismissed all claims. This appeal followed.

## II. STANDARD OF REVIEW

Because this appeal arises from a bench trial, the governing standard of review is set forth in CR 52.01. In actions tried without a jury, the trial court must "find the facts specifically and state separately its conclusions of law" supporting the judgment. CR 52.01. On appeal, the trial court's factual findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*

This standard reflects the fundamental principle that "judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Vinson v. Sorrell*, 136 S.W.3d 465, 470 (Ky. 2004) (quoting *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)). A factual finding is not clearly erroneous if it is supported by substantial evidence, meaning evidence of substance and relevant consequence sufficient to induce conviction in the mind of a reasonable factfinder. *Goshorn v. Wilson*, 372 S.W.3d 436, 439 (Ky. App. 2012); *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky. App. 2005). Even where the evidence is conflicting, or where an appellate court might have reached a different result, "mere doubt as to the correctness of [the] finding [will] not justify [its] reversal." *Moore*, 110 S.W.3d at 354 (citation omitted).

If the factual findings are supported by substantial evidence, our role is confined to determining whether those facts support the trial court's legal conclusions. *Commonwealth v. Deloney*, 20 S.W.3d 471, 473–74 (Ky. 2000). Although we afford substantial deference to factual findings, the trial court's legal determinations and conclusions of law are reviewed *de novo*. *Sawyers v. Beller*, 384 S.W.3d 107, 110 (Ky. 2012); *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016).

-15-

# III. ANALYSIS

## A. *Applicable Legal Principles*

Gatchel's primary argument on appeal is that the trial court applied the wrong legal standard in evaluating his nondisclosure claims. We begin, therefore, with the applicable legal framework.

Kentucky generally adheres to the doctrine of *caveat emptor* in real estate transactions when the purchaser has the opportunity to observe the property's condition, and no representations are made. *Fannon v. Carden*, 240 S.W.2d 101, 103 (Ky. 1951). That maxim is not absolute. A seller may be liable when he knowingly conceals or fails to disclose a latent material defect that is known to him and not known to the buyer. *Waldridge v. Homeservices of Kentucky, Inc.*, 384 S.W.3d 165, 171–72 (Ky. App. 2011). As the Court stated in *Bryant v. Troutman*, the intentional suppression of facts known to the seller and unknown to the purchaser can support an action for deceit. 287 S.W.2d 918, 920–21 (Ky. 1956).

However, Kentucky courts have also consistently held that mere silence does not constitute fraud when the condition is open, obvious, or discoverable through ordinary diligence. *Id.* at 921. The issue is therefore whether a seller knows of a latent defect that the buyer could not reasonably discover and intentionally fails to disclose it, or intentionally misrepresents the facts.

-16-

To prevail on a claim for fraudulent misrepresentation, a plaintiff must prove by clear and convincing evidence a material representation that is false, known to be false or made recklessly, made with the intention that it be acted upon, acted upon in reliance, and causing injury. *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). A fraudulent omission claim requires proof of a duty to disclose a material fact, a failure to disclose it, inducement to act, and resulting damages. *Waldridge*, 384 S.W.3d at 171. Both theories require scienter in the form of knowledge of falsity or reckless disregard for the truth. *Id.* Kentucky does not impose liability for nondisclosure in the absence of actual or constructive knowledge. *Id.*

Gatchel asserts that the trial court evaluated his claims under an erroneously narrow standard that looked only to the sellers' subjective beliefs. He contends that the proper framework is found in cases such as *Bryant*, *Waldridge*, *Kaze v. Compton*, 283 S.W.2d 204 (Ky. 1955), and *Grant v. Wrona*, 662 S.W.2d 227 (Ky. App. 1983). These cases do not eliminate the requirement that the seller must have known of the defect or must have acted in reckless disregard of its existence. Each of these decisions involved a condition that was both latent and known to the seller, coupled with conduct amounting to concealment or *intentional* omission.

-17-

Nothing in the authorities Gatchel cites removes the scienter requirement or transforms Kentucky into a strict liability jurisdiction for real estate nondisclosure. The trial court therefore applied the correct legal principles when it examined what the Opells knew about the conditions of their property, whether they regarded any condition as a defect, and whether the evidence demonstrated intentional concealment or omission. With the proper legal framework confirmed, we turn to the application of those principles to the pleaded claims.

## B. Erosion and Drainage Issues

Applying the foregoing principles, substantial evidence supports the trial court's determination that the Opells neither fraudulently misrepresented nor fraudulently omitted any material information concerning erosion or drainage on the property.

The record reflects that the property sits on steep terrain overlooking Lake Barkley. The trial court found that the Opells experienced only minor rutting in the gravel driveway following heavy rains, which they addressed through routine raking and maintenance. Terry Opell testified that water occasionally collected around rocks in the driveway, but was easily remedied once the surface was smoothed. Nancy Opell similarly described the maintenance performed after storms as ordinary and not indicative of any significant erosion problem. Their testimony was credited by the trial court.

No evidence established that the Opells regarded erosion or drainage as a material defect during their ownership. The Bells, who lived adjacent to the property year-round and shared use of the wet cell system, never complained of erosion or drainage problems. Martin resided on the property after the 2007 sale, and Gatchel testified that she did not report any drainage-related issues to him. Gatchel himself testified that he observed no drainage concerns during his initial tour of the property or during his early visits.

Under Kentucky law, a seller has no duty to disclose conditions that are open, obvious, or discoverable through the exercise of ordinary diligence. *Bryant*, 287 S.W.2d at 921. The steep topography of the property and the natural flow of water after rainfall were readily observable conditions that placed Gatchel on notice to investigate further if drainage was a concern to him. The trial court also found no evidence that the Opells engaged in any effort to conceal erosion through the addition of fill dirt, by disguising washouts, or by performing last-minute cosmetic repairs. To the contrary, the maintenance they performed was consistent with what they reasonably viewed as ordinary upkeep for a rural lakeside property.

The trial court further noted that once Gatchel installed a concrete driveway, the speed and volume of runoff increased, which altered the flow of water beneath the trailers. Gatchel himself testified that he was "fighting Mother

-19-

Nature" with respect to ongoing erosion. The trial court was entitled to weigh this evidence and to conclude that the conditions Gatchel later encountered were not the product of any material misrepresentation or concealment by the Opells at the time of sale. Because the trial court's findings regarding erosion and drainage are supported by substantial evidence and are not clearly erroneous, they will not be disturbed on appeal.

**C. Septic/Wet Cell System**

Substantial evidence likewise supports the trial court's conclusion that the Opells did not intentionally misrepresent the nature or condition of the septic system. The Seller's Disclosure Form identified the type of system on the property as a wet cell system. In the portion of the form addressing inspections, the Opells placed a question mark, and they indicated they were not aware of any problems with the system. The Opells testified that this reflected their understanding of the system's condition during their ownership. They explained that they had relied on the installer, Jim Oates, to obtain the necessary permits and to ensure the installation complied with the health department's requirements. They had no experience installing such systems themselves, were never advised by the health department that any aspect of the system was improper, and never experienced operational issues.

The evidence showed that the Opells performed routine maintenance by planting aquatic vegetation and adding Rid-X, and that neither they nor the Bells, who shared the system, encountered problems. Although Gatchel later experienced odor and drainage concerns, the trial court found credible the Opells' testimony that they were unaware of any defect that would require disclosure.

It also bears emphasis that the Seller's Disclosure is completed by homeowners acting as laypersons and reflects only the knowledge and experience a layperson would reasonably possess. It is not a substitute for a professional home inspection, engineering evaluation, or regulatory compliance review. Nothing prevented Gatchel from retaining a professional to examine and opine on the wet cell system prior to closing. Given that such systems are not especially common and are inherently technical, a prudent purchaser could reasonably be expected to seek such an inspection. In any event, based on the testimony and other evidence of record, we cannot conclude that the trial court abused its discretion in determining that the Opells did not intentionally misrepresent the operational status of the septic system.

## D. *Unpleaded Claims Addressed by the Trial Court*

In addition to the claims pleaded in the complaint, Gatchel raised issues at trial related to wasps, the roof, and the boat dock. Although these issues were not pleaded in the complaint, the trial court addressed them in its findings.

We do the same in order to determine whether the court properly denied Gatchel's post-trial motion to amend his pleadings to add fraud claims related to these issues.

*Wasps.* The Seller's Disclosure Form asked: "Are you aware of any present or past wood infestation (i.e., termites, borers, carpenter ants, fungi, etc.)?" The form is directed at organisms that damage structural components of a home. Wasps are not included in the list of examples and are not generally considered by laypersons to be wood-destroying insects or anything beyond a minor annoyance. Moreover, Gatchel did not testify that the wasps he encountered caused any wood damage. The Opells testified that they treated for wasps only occasionally and that they regularly slept in the bedroom where Gatchel later observed them. The trial court found no evidence that the Opells misrepresented or concealed a material condition related to wasps.

Substantial evidence supports that finding. Wasps are a common nuisance in Kentucky, particularly in the warmer months. Many homeowners keep wasp spray and flyswatters handy for this very reason, but would not consider their homes to be infested. Nothing in this record compels a conclusion that the Opells knew of, or failed to disclose, any material defect relating to a wasp "infestation." The trial court's finding was not clearly erroneous.

*Roof Condition.* The Seller's Disclosure Form reflected that the roof had been repaired in the past and had not leaked within the prior three years.

Gatchel offered only his own testimony, suggesting a subsequent leak was caused due to known roof damage that the Opells failed to disclose at the time of sale. As a result, the trial court found that Gatchel failed to prove intentional misrepresentation or concealment with respect to the roof.

The record supports that conclusion. The Opells disclosed that the roof had experienced earlier problems, which should have alerted a reasonable buyer to the importance of further inquiry or inspection. A representation that the roof had not leaked for three years is not a guarantee that it is free from all defects or that it will never leak again. Without proof that the statement was false when made, or that the Opells knew it to be false, the trial court did not err. Its finding was supported by substantial evidence.

*Boat Dock*. As for the boat dock, the trial court found that the issues identified by Gatchel were first observed years after his purchase and that no evidence established the Opells' knowledge of any defect at the time of sale. The record contains no compelling contrary evidence. The court's finding that the Opells did not fraudulently conceal any condition of the dock was supported by substantial evidence.

*Effect on Motion to Amend*. Because each unpleaded theory failed on its merits, the trial court concluded that amendment after trial would be futile. A trial court may deny amendment where the proposed claim could not survive as

a matter of law. *Bank One, Kentucky, N.A. v. Murphy*, 52 S.W.3d 540, 544 (Ky. 2001). The decision rests within the court's discretion and will not be disturbed absent an abuse of that discretion. *Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 779 (Ky. App. 2000). Futility is a proper ground for denial under CR 15.02. *Insight Kentucky Partners II, L.P. v. Preferred Automotive Services, Inc.*, 514 S.W.3d 537, 555 (Ky. App. 2016).

Given the trial court's factual findings rejecting the wasp, roof, and dock theories, the court did not abuse its discretion in denying amendment. Allowing Gatchel to amend his complaint to add claims the trial court had already determined lacked merit would have been futile.

### E. Proposed Claim Under KRS[5] 446.070 and KRS 224.70-110

Gatchel also sought to amend his complaint to assert a statutory claim under KRS[6] 446.070 based on an alleged violation of KRS 224.70-110. KRS 224.70-110 prohibits any person from discharging or permitting the discharge of pollutants into the waters of the Commonwealth in violation of environmental standards or permitting requirements. The trial court denied the amendment,

---

[5] Kentucky Revised Statutes.

[6] This statute provides: "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." *Id.*

concluding that the proposed claim did not relate back under CR 15.03 and was therefore barred by the statute of limitations.

We agree. "[A]n action for damages under KRS 446.070 for violation of a statutory right is subject to the five-year statute of limitations in KRS 413.120(2)." *Hickey v. General Electric Company*, 539 S.W.3d 19, 23 (Ky. 2018). The alleged conduct forming the basis of the proposed statutory claim would necessarily have occurred during the Opells' ownership of the property, which ended in 2007. Any such claim was therefore time-barred well before Gatchel sought to amend in 2023. A trial court acts within its discretion when it denies an amendment that would introduce a claim barred by limitations. *Murphy*, 52 S.W.3d at 544.

Moreover, Gatchel's appellate briefing provides no meaningful explanation of how the Opells' conduct constituted a violation of KRS 224.70-110 or how the statute would apply to the installation or operation of a wet cell septic system under these circumstances. Although his brief cites KRS 446.070, it does not identify the operative language of KRS 224.70-110, does not articulate how the Opells allegedly violated it, and does not address the trial court's limitations analysis.

An appellant must present a developed argument with citation to authority and to the record. It is not the role of this Court to search out and

construct arguments for a party. *Jones by and through Jones v. IC Bus, LLC*, 626 S.W.3d 661, 686 (Ky. App. 2020) ("We will not search the record to construct Appellants' argument for them, nor will we go on a fishing expedition to find support for their underdeveloped argument."). Because the proposed statutory claim was untimely and undeveloped, the trial court did not abuse its discretion in denying the amendment.

## IV. CONCLUSION

The trial court's findings of fact were supported by substantial evidence, and its legal conclusions were correct. The record does not establish that the Opells knowingly misrepresented or concealed any material condition of the property, nor does it demonstrate that they failed to disclose a defect they were legally obligated to reveal. The court also acted within its discretion in denying Gatchel's post-trial motion to amend his pleadings, as the proposed claims lacked factual and legal merit and, in the case of the statutory claim, were time-barred. For these reasons, we affirm the Trigg Circuit Court's judgment in favor of the Opells.


ALL CONCUR.

BRIEFS FOR APPELLANT:

Kenneth W. Humphries
Hopkinsville, Kentucky

BRIEF FOR APPELLEES:

H.B. Quinn
Cadiz, Kentucky